Gen. 431]                                                                431

## STADIUM AUTHORITY

INDEMNIFICATION AGREEMENTS — FUNDING REQUIREMENT AND
RESTRICTIONS

April 13, 1994

*The Honorable Melvin A. Steinberg*
*Lieutenant Governor*

You have requested our opinion concerning the legal authority of the Maryland Stadium Authority to enter into an indemnification agreement. Specifically, your question is whether "the Stadium Authority [may] fund damages for lease terminations in other states or reimburse professional sports franchises for their legal fees in matters involving actions brought as a result of a relocation of a football franchise from another state."

For the reasons stated below, we conclude that the Maryland Stadium Authority may enter into indemnification agreements related to costs associated with a football franchise's efforts to relocate to Baltimore only if the agreement is backed by funds that are available to the Stadium Authority for this purpose or the agreement is otherwise made contingent on the future availability of funds to pay the indemnification.

## I

### The Stadium Authority And A Football Franchise

We have no doubt that the Stadium Authority acts in furtherance of its statutory purposes when it seeks to attract a National Football League team to Baltimore. The "sports facility" that the Authority is to construct includes a stadium "for the primary purpose of holding professional football games ...." §13-701(c)(1) of the Financial Institutions ("FI") Article, Maryland Code. Moreover, one of the prerequisites to the Authority's closing on the sale of bonds is the securing, "[w]ith respect to site acquisition and the construction of a football stadium, a franchise for a National Football League team and a long-term lease." FI §13-712.1(4)(ii). No one could doubt that the Stadium Authority was pursuing its

statutory responsibilities, when, for example, it participated intensively in an effort to obtain an NFL expansion team for Baltimore. The Court of Appeals observed that one of the Authority's objectives was "to give the State the best possible chance to retain a National Football League (NFL) franchise upon expansion of the league." *Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 471, 530 A.2d 245 (1987) (citing Department of Fiscal Services, *The Stadium Issue* 1 (1987)). We see no difference in this regard when the Stadium Authority seeks to attract an existing NFL franchise instead of an expansion team.

The Stadium Authority has been granted extensive powers to carry out the purposes for which it was created. It may "[e]nter into contracts of any kind, and execute all instruments necessary or convenient with respect to its carrying out the powers in this subtitle to accomplish the purposes of the Authority." FI §13-708(a)(10). It may "[d]o all things necessary or convenient to carry out the powers granted by this subtitle." FI §13-708(a)(18). In addition, it may "[e]xercise all the corporate powers granted Maryland corporations under the Maryland General Corporation Law." FI §13-708(a)(16). Under the General Corporation Law, a Maryland corporation may "[m]ake contracts and guarantees [and] incur liabilities ..." and "[d]o every other act not inconsistent with law which is appropriate to promote and attain the purposes set forth in its charter." §2-103(5) and (17) of the Corporations and Associations Article, Maryland Code.

Under these grants of authority, the Stadium Authority may enter an agreement to indemnify the owner of an NFL franchise for costs that the owner might incur in an effort to move the team to Baltimore. For example, if the NFL disapproved of the move and sought to enforce through litigation the league's purported right to prevent it, the owner would incur substantial legal fees. An owner might well not be willing to consider a move unless the owner were protected against this risk. Because an indemnity agreement of this kind would be reasonably incidental to the Stadium Authority's effort to obtain an NFL franchise, the provisions cited above would enable the Authority to agree to indemnify the owner against these costs − subject to the availability of funds for this purpose, as discussed in Part II below.

## II

**Funding Of An Indemnification Agreement**

In 71 *Opinions of the Attorney General* 274 (1986), this office considered the authority of a State official to enter into a contract under which the State would agree to indemnify the manufacturer of a product against any liability arising out of the manufacture or use of the product. In that opinion, the Attorney General advised that indemnity clauses are not "per se improper" and might "fall within the discretion of a contracting officer." 71 *Opinions of the Attorney General* at 278. But a contracting officer did not have the authority, the Attorney General concluded, to agree to an indemnity clause that might subject the State to substantial liability unless there were a source of funds to pay for the liability thus contracted.

The problem with an indemnity clause that is not backed up by a source of funds, the Attorney General pointed out, is that "[i]f a judgment were rendered under the indemnity clause, the Governor would then be obliged to include in the budget bill an amount sufficient to fund the judgment.... To this extent, the Governor's discretion over the formulation of the budget bill would be impaired.... A contract having that restrictive effect on the Governor's discretion is contrary to public policy...." 71 *Opinions of the Attorney General* at 279. This problem does not arise, however, if the risk is insured, appropriations are already available to fund the indemnity agreement, or "the agreement itself ... indicate[s] expressly that any indemnity payment is conditioned upon available appropriations at the time of the loss." 71 *Opinions of the Attorney General* at 280 n.7.

This analysis applies to any indemnity agreement entered by the Maryland Stadium Authority. If there is no existing source of funds to back up the agreement, then the agreement must be expressly conditioned on the availability of funds at the time that payment would be required. Hence, we next consider whether any funds available to the Stadium Authority may be used for this purpose.

Under FI §13-715(b), "[t]he Authority shall use the Maryland Stadium Authority Financing Fund as a nonlapsing revolving fund for carrying out the provisions of this subtitle related to sports

facilities and other facilities at Camden Yards."[1]  All of the revenue sources related to the baseball and football stadiums contribute to the Financing Fund.  FI §13-715(c).  The primary use of money in the Financing Fund is "the payment of debt service on authority bonds for sports facilities, and all reasonable charges and expenses related to Authority borrowing and the management of Authority obligations related to Camden Yards facilities."  FI §13-715(e).  Indeed, as we understand the financing arrangements for the facilities at Camden Yards, the money that ordinarily flows into the Financing Fund is fully committed to bond repayment and other fixed costs.  The Financing Fund does not presently contain a reservoir of cash that would be available to back up an indemnity agreement.

Thus, if the Stadium Authority were to be able to finance an indemnity agreement, a new infusion of money into the Financing fund would be needed.  The Budget Bills for Fiscal Years 1994 and 1995 contain no appropriation of this kind.  Hence, we consider other possible funding sources.

The Stadium Authority has express power to "borrow money from any source for any corporate purpose ...."  FI §13-708(a)(13).  Because an indemnity agreement that is part of an effort to obtain an NFL franchise is in furtherance of a "corporate purpose" of the Stadium Authority, as discussed in Part I above, borrowed funds could be used for this purpose.  The approval of the Board of Public

---

[1] Prior to the enactment of Chapter 400 of the Laws of Maryland 1993, which authorized the Stadium Authority to develop an expanded Baltimore City Convention Center, the language of FI §13-715(b) was as follows:  "The Authority shall use the Maryland Stadium Authority Financing Fund as a nonlapsing revolving fund for carrying out the provisions of this subtitle."  The new phrase "related to sports facilities and other facilities at Camden Yards" was evidently added to make clear that the Maryland Stadium Authority Financing Fund was not to be a source of revenue for the Convention Center project.  Rather, the General Assembly created a "Baltimore Convention Center Financing Fund" for that purpose.  *See* FI §13-716.  We do not believe that the change in the wording of FI §13-715(b) was intended to reduce the scope of the Authority's discretion to spend money from the Maryland Stadium Authority Financing Fund in pursuit of an NFL franchise.  Obtaining the franchise is surely "related to sports facilities ... at Camden Yards."  *See* Part I above.

Works would be a prerequisite to any such borrowing, however. FI §13-708(a)(13).[2]

Under §9-120(b) of the State Government Article, Maryland Code, proceeds of certain sports lotteries are paid into the Maryland Stadium Facilities Fund. The Facilities Fund, established in §7-312 of the State Finance and Procurement ("SF") Article, Maryland Code, is "the depository for the net proceeds realized from the sports lotteries (these monies being the revenue source enabling the State to make its annual appropriation to the Authority's Financing Fund for debt service purposes)." *Kelly*, 310 Md. at 460.

Although money in the Facilities Fund is appropriated and transferred to the Maryland Stadium Authority Financing Fund, SF §7-312(e) restricts the use of these lottery funds:

> Moneys credited to the Maryland Stadium Facilities Fund may be used, in accordance with approved comprehensive financing plans, to:
>
> (1)  pay rent to the Maryland Stadium Authority;
>
> (2)  with the approval of the Board of Public Works, make grants or loans not exceeding $1 million in any fiscal year, to the Authority for its corporate purposes;
>
> (3)  with the approval of the Board of Public Works, finance capital construction in lieu of issuing bonds; or

---

[2] Under FI §13-712.1, the Stadium Authority "may not close on the sale of bonds which constitute tax supported debt of the State, and may not otherwise borrow money in amounts exceeding $35,000 per year, to finance any segment of a facility ..." without various submissions to the Legislative Policy Committee and the fiscal committees of the General Assembly. Borrowing to finance an indemnification agreement is not borrowing "to finance any segment of a facility ...." A "facility" means the physical plant of the stadium and associated properties. FI §13-701(c) and (k). When the General Assembly intended to include incorporeal property within the term "facility," it did so expressly, and with respect to the "Convention Center facilities" only. FI §13-701(g)(3)(iii).

> (4) financially support, through equity
> investment, loan, guarantee, or otherwise, full
> or partial private financing of any element of
> the facility.

As we have already discussed, an indemnity agreement as part of an effort to attract an NFL franchise would be consistent with the "corporate purposes" of the Stadium Authority. Therefore, up to $1 million of money in the Facilities Fund may be granted or loaned annually to the Authority to back up an indemnity agreement, if this action were approved by the Board of Public Works and were in accordance with approved comprehensive financing plans of the Authority.[3] None of the other permitted uses of the Facilities Fund would apply to the type of indemnity agreement about which you inquire.[4]

Finally, to the extent that the Board of Public Works did approve proposed borrowing by the Stadium Authority or make Facilities Fund money available for purposes of funding an indemnity agreement, the Stadium Authority would not be permitted to expend the money for this purpose during Fiscal Year 1995 "without the Legislative Policy Committee['s] having 45 days to review and comment on the proposed use of funds." Chapter 8, Laws of Maryland 1994 (Item 23.01.03.02).

---

[3] As a practical matter, much of this $1 million annual draw is needed for salaries and other operational expenses of the Stadium Authority.

[4] If "any element" of the football stadium were privately financed, in whole or in part, the Facilities Fund could be used to "financially support" that private financing. SF §7-312(e)(4). If the Stadium Authority were to make contractual commitments as part of an equity investment or other form of financial support, Facilities Fund revenues could be used to pay for that commitment. *See also* FI §13-710 (with prior approval of the Board of Public Works, Stadium Authority may hold an ownership interest in a professional football team).

### III

### Conclusion

In summary, it is our opinion that the Maryland Stadium Authority may execute an indemnity agreement as part of an effort to attract a National Football League team to Baltimore, contingent upon the availability of funds for this purpose.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*